## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **John Doe,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. 2:23-cv-2996** |
| **v.** | : | |
| | : | **Judge Watson** |
| **The Ohio State University,** | : | **Magistrate Judge Deavers** |
| | : | |
| **Defendant.** | : | **JURY TRIAL** |
| | : | **ENDORSED HEREON** |

i

## **INTRODUCTION**

1.      This action is yet another example in a growing number of cases where institutions of higher learning retain physicians that turn out to be sexual predators.  And, instead of protecting its students, the school—in this case The Ohio State University ("OSU")—ignores the sexual misconduct of its employee, fails to inform its students that a sexual predator (cloaked by the school as a health care professional) is in their midst, and ultimately covers up evidence of the sexual predation of which it was well-aware.

2.      In this specific action the sexual predator was Dr. Richard Strauss ("Dr. Strauss"), and the victim was John Doe ("JD").

3.      Dr. Strauss was hired by OSU in or about 1978 and worked as a physician and professor at OSU until in or about March of 1998.

4.      As early as 1978, OSU supervisors and administrators had knowledge of Dr. Strauss's sexual predation of OSU students, yet made absolutely no effort whatsoever to inform its students about, or protect its students from, Dr. Strauss until nearly twenty (20) years later.

5.      Indeed, as concluded in the *Governor's Working Group on Reviewing the Medical Board's Handling of the Investigation Involving Richard Strauss Report* (August 30, 2019) ("Governor's Medical Board Report"): "Despite multiple supervising and colleague physicians who were aware of complaints/rumors against [Dr.] Strauss as far back as 1979, no [OSU] physician reported any wrongdoing by [Dr.] Strauss to the State Medical Board of Ohio.  More troubling, it appears the abuse was never reported to law enforcement by anyone at [OSU] or the Medical Board."[1]  The Governor's Medical Board Report, a report of the Ohio Department of Public Safety investigating the administrators within its largest State educational institution (*i.e.*,

---

[1] *Id.*, at pg. 2.

OSU), found this to be an "astounding failure of anyone in a position of authority to come forward to initiate a Medical Board or criminal investigation into [Dr.] Strauss's conduct."[2]

6.    In a OSU annual crime report relating to the illicit sexual conduct of Dr. Strauss, issued in December 2020, OSU disclosed that Dr. Strauss committed at least 127 rapes, and at least 2,201 other sexual assaults on OSU students and student-athletes during his employment at OSU.[3] At these numbers, even calling it an "astounding failure" does not truly capture the horrors OSU beset upon its students through OSU's (i) hiring of Dr. Strauss without a meaningful background check, (ii) allowing Dr. Strauss to remain as a treating OSU physician after reports of his sexual assaults on students began to pour in during Dr. Strauss's very first year at OSU, (iii) enabling Dr. Strauss's sexual assaults to continue by taking no action against him even after at least scores of reports of Dr. Strauss's sexual abuse were received by OSU administrators, and (iv) covering up, making excuses for, and failing to report Dr. Strauss to law enforcement even after an OSU investigation itself concluded that Dr. Strauss was a sexual predator.

7.    Plaintiff herein, JD, attended OSU from 1986—at least seven (7) years after OSU already knew of Dr. Strauss's sexual predation of students and student-athletes—until 1988.

8.    During his time at OSU, JD was a member of OSU's NCAA Division I Football Team. Although Dr. Strauss gave required yearly physicals for the OSU Football Team, it does not appear that Dr. Strauss was specifically assigned to the Football Team. On the initial occasion where Dr. Strauss sexually abused and assaulted JD, however, it was indeed in the context of OSU Football Team activities. As described more fully below, on the first occasion of JD's abuse by Dr. Strauss, JD was directed to visit Dr. Strauss by OSU Football Team personnel.

---

[2] *Id.*

[3] https://news.osu.edu/university-issues-annual-crime-report-reminds-community-of-safety-resources/ (last visited on September 5, 2023).

9.     The second and final occasion upon which JD was abused and assaulted by Dr. Strauss occurred a few weeks following the first, when Dr. Strauss instructed JD to return for a follow up visit—under the guise that the follow up was required by OSU.

10.     Until no earlier than late-2022, JD did not even appreciate that he was sexually assaulted by Dr. Strauss during his two exams by Dr. Strauss while JD was an OSU student-athlete. It was only after speaking with former teammates in late-2022 that he realized the exams he received amounted to sexual assault. Until that time, JD knew Dr. Struss's exams were unusual, uncomfortable, and highly embarrassing for JD, but he did not know they were part of a consistent pattern of sexual abuse and assault by Dr. Strauss of OSU student-athletes.

11.     Moreover, until late-2022, JD had no idea that OSU was aware Dr. Strauss was a sexual predator preying on OSU students and student-athletes—as early as 1978. Until no earlier than late-2022, JD was entirely unaware of the massive scope of Dr. Strauss's sexual predation before, during, and after JD attended OSU. Until no earlier than late-2022, did JD become aware that any other OSU students and student-athletes had been sexually abused and assaulted by Dr. Strauss.

a)     **JD's Interactions with Dr. Strauss**

  i.     **Spring 1986**

12.     In or about Spring of 1986, JD was directed by OSU Football Team personnel to see Dr. Strauss for a medical examination as part of required OSU Football Team participation. The "medical examination" took place in the Ernie Biggs Athletic Training Facility on OSU's Columbus, Ohio campus.

13.     When JD entered the exam room for his exam, Dr. Strauss immediately instructed JD to drop his shorts and underwear all the way to the floor. JD thought this was odd but complied with Dr. Strauss's instruction.

14.     Dr. Strauss then began to examine JD's genital region for what seemed like an exorbitant amount of time. As the exam went on, Dr. Strauss instructed JD to bend over.

15.     Dr. Strauss then inserted one or more of his fingers into JD's rectum. The insertion of Dr. Strauss's finger(s) into JD's rectum was uncomfortable and at points extremely painful for JD, but JD thought it was just part of the exam.

16.     Dr. Strauss then moved his inserted finger(s) around the inside of JD's rectum (resulting in extreme pain for JD), while at the same time manipulating JD's penis in what was (as JD now recognizes) an apparent effort to get JD to climax. Dr. Strauss did this for several minutes, to the extreme discomfort and embarrassment of JD.

17.     Although JD did what he could to mentally stop the process, JD involuntarily ejaculated onto Dr. Strauss's hand holding JD's penis.

18.     JD was incredibly embarrassed, said nothing to Dr. Strauss, and remained bent over.

19.     Dr. Strauss, after JD ejaculated on his hand, removed his finger(s) from JD's rectum and proceeded to "play" with JD's semen. Dr. Strauss rubbed JD's semen on Dr. Strauss's own hand(s), seeming to inspect JD's semen in great detail. Dr. Strauss continued to closely inspect and "play" with JD's semen for approximately five minutes.

20.     JD knew this "exam" was odd but believed that Dr. Strauss was nonetheless acting within the bounds of his medical profession. Indeed, beyond the extreme embarrassment, JD left

the exam room concerned that something may have been wrong with his genitals or sexual function.

21.     A few weeks later, Dr. Strauss reached out to JD and asked that JD come back for a follow up exam.  JD, still somewhat concerned that something may be wrong, complied with Dr. Strauss's request.

22.     Similar to the first exam, Dr. Strauss immediately told JD to drop his pants for the exam.  Although Dr. Strauss did not anally penetrate JD during this second exam, Dr. Strauss spent the entire 10-15 minutes of the exam fondling and very closely inspecting JD's penis.  JD, once again concerned that something was wrong given the length of the exam and heavy focus on his penis, asked Dr. Strauss if everything was OK.

23.     Once Dr. Strauss indicated that all was well with JD's genitals, JD quickly left the exam room.  JD never saw Dr. Strauss again, despite Dr. Strauss contacting JD on multiple occasions for further exams.

> **b)     "Appropriate Persons" at OSU Knew of Dr. Strauss's Predation and Did Nothing**

24.     In or about April 2018, the law firm of Perkins Coie began an "independent investigation" into the alleged sexual misconduct of Dr. Strauss during his employment at OSU. In or about May 2019, Perkins Coie publicly released its report.[4]  The Perkins Coie Report publicly and indisputably revealed—for the first time—that many OSU employees and officials ("appropriate persons" under operative law) received scores of credible reports that Dr. Strauss was sexually assaulting students throughout his career as an OSU employee and athletic team physician,

---

[4]  *See* Perkins Coie LLP, *Report of the Independent Investigation, Sexual Abuse Committed by Dr. Richard Strauss at The Ohio State University*, May 15, 2019, (hereinafter "Perkins Coie Report").

but that OSU failed to take any action in removing Dr. Strauss from his position, report him to the proper authorities, nor do anything to inform or protect OSU students from Dr. Strauss.

25.     Due to OSU's inexcusable failures and cover-up of Dr. Strauss's sexual predatory conduct—which began no later than 1979 and fully revealed only in 2019—OSU's conduct resulted in OSU students and student-athletes being repeatedly, *inter alia*, (i) anally raped; (ii) sodomized; (iii) digitally penetrated for no medical purpose; (iv) had their genitals inspected, rubbed, and massaged for no medical purpose; and, (v) subjected to psychological distress during exams while Dr. Strauss inappropriately touched them for no purpose other than for Dr. Strauss's perverted sexual gratification.

26.     As shocking as Dr. Strauss's criminal conduct set upon OSU students and student-athletes is, OSU's complicity by ignoring, enabling, and covering up Dr. Strauss's conduct is equally appalling given that OSU, its administrators, and its staff were supposed to—and in fact were legally obligated to—protect OSU's young and vulnerable student body from these horrors.

27.     Indeed, despite receiving numerous credible reports of Dr. Strauss's sexual abuse of OSU students and student-athletes by no later than 1979 (and then no less than hundreds of reports as the years past), OSU continued to employ Dr. Strauss, appointed him as the official team doctor of numerous varsity sports and to the OSU Medical Clinic ("Clinic")—thereby permitting him to examine and treat students and student-athletes unchaperoned and behind closed doors—and failed to take any reasonable steps whatsoever to prevent Dr. Strauss from sexually assaulting OSU students, until at least 1996.[5]

28.     As the Perkins Coie Report and accounts of other victims in this matter make clear, for literally decades OSU was deliberately indifferent to rampant sexual abuse of OSU students by

---

[5] Perkins Coie Report, pg. 1.

Dr. Strauss. Specifically, as far back as 1979, during Dr. Strauss's first year of employment at OSU, numerous OSU officials knew Dr. Strauss was sexually assaulting male students and male student-athletes. If OSU had reasonably acted on this knowledge, the abuse could have been stopped shortly after it started and scores of victims, including JD, could have avoided the horrific sexual abuse they suffered at the hands of Dr. Strauss. But OSU turned a blind eye and did absolutely nothing, knowing OSU's students were at substantial risk of being sexually abused by a known sexual predator, and indeed one cloaked as a responsible physician and person of authority by OSU itself.

29.     Instead, OSU allowed and enabled a sexual predator to remain employed at OSU for nearly twenty (20) years, and even required some of its student-athletes, like JD, to obtain medical exams and treatment from Dr. Strauss knowing that those student-athletes had a high likelihood of being sexually abused by Dr. Strauss.

30.     Incredibly, for the entire length of Dr. Strauss's tenure at OSU, and even thereafter, OSU was deliberately indifferent to the safety of its students and student-athletes by (i) failing to meaningfully investigate the many complaints of Dr. Strauss's sexual abuse and harassment, (ii) failing to share reports of Dr. Strauss's sexual abuse and harassment, (iii) failing to report such conduct to the Ohio State Medical Board or to law enforcement, and (iv) failing to restrict or remove Dr. Strauss from his positions of authority over OSU students. If OSU had met these legal obligations, the sexual assault, the sexual abuse, and the related suffering of OSU's students and student-athletes (including JD)—at the hands of Dr. Strauss—would have been prevented.

31.     Instead, OSU employed Dr. Strauss to provide medical care and treatment to OSU's students and student-athletes, appointing Dr. Strauss as an assistant professor of medicine, making

him the team doctor for numerous varsity sports, and having him take on-call rotations at the Clinic, ensuring that his predation would expand beyond OSU's student-athletes.

32. Dr. Strauss used this position of trust and confidence to repeatedly and consistently sexually assault OSU students and student-athletes under his care. He would not have had this opportunity if it were not for this position given to him by OSU.

## JURISDICTION AND VENUE

33. JD incorporates by reference the allegations contained in the previous paragraphs set forth above, as if fully set forth herein and below.

34. This action is brought pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, as more fully set forth herein.

35. This Court has subject matter jurisdiction pursuant to 28 U.S.C § 1331.

36. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because OSU resides in this District and the events giving rise to JD's claims arose in this District.

## PARTIES

37. JD incorporates by reference the allegations contained in the previous paragraphs set forth above, as if fully set forth herein and below.

38. JD is a resident of Ohio and attended college at OSU from 1986 to 1988.

39. Defendant OSU is a large, public university residing, *inter alia*, in Columbus, Ohio. OSU is, and at all relevant times has been, a State of Ohio owned and operated public university and institution of higher education organized and existing under laws of the State of Ohio. OSU receives federal financial assistance and is therefore subject to Title IX, 20 U.S.C. § 1681, *etseq*.

40. At all times relevant hereto, OSU was complicit and deliberately indifferent to the sexual assault and sexually abusive conduct of Dr. Strauss. At all times relevant hereto, OSU was

complicit and deliberately indifferent to reports it received regarding Dr. Strauss's sexually abusive conduct.

41.     At all times relevant hereto, non-party Dr. Strauss was an actual or apparent, duly authorized agent, servant, or employee of OSU and performed medical services for OSU student-patients and members of the OSU community as part of his employment at OSU.

42.     In or about 2005, Dr. Strauss committed suicide.

## ADDITIONAL FACTUAL ALLEGATIONS[6]

### I.     JD and Dr. Strauss

### a)     JD's Sexual Abuse by Dr. Strauss and Lack of Knowledge

43.     As set forth above, JD was sexually assaulted by Dr. Strauss on two (2) separate occasions during purported *physical examinations* mandated by OSU.

44.     After JD's exams by Dr. Strauss, JD recognized that Dr. Strauss's methods were highly unusual, but JD was unsure about what he could or should do.  JD had no knowledge that Dr. Strauss's conduct amounted to the commission sexual assault against JD and (apparently) many other OSU student-athletes.

### b)     The Impact of Dr. Strauss's Abuse of JD

45.     Although JD did not appreciate that he was abused until very recently, JD—since his first experience with Dr. Strauss—has been fearful of any form of rectal exam.  Indeed, now over 60 years old, JD has never had a colonoscopy in his entire life despite universal recommendation for such an exam for someone his age.  JD, due to the experience with Dr. Strauss, has a pathological fear that a colonoscopy may result in unintended ejaculation, much like it did

---

[6] JD incorporates by reference all allegations set forth above, as if fully set forth herein and below.

with Dr. Strauss. Thus, JD has refused this necessary exam despite objections from numerous physicians.

46.     To date, and over the last decade, JD has been dropped by numerous physicians because he has refused a necessary colonoscopy at every turn. His doctors fear that without one, JD is subjecting himself to unnecessary health risks and each of his now-former doctors refused to keep him on as a patient, likely due to their own potential liability, but regardless to JD's detriment.

### c)     JD Learns That He Was Abused and that Others Were As Well

47.     In or about late-2022, while speaking with a former OSU teammate, JD learned for the first time that other OSU students and student-athletes had been subject to similar treatment by Dr. Strauss and that such treatment amounted to sexual abuse.

48.     Upon discovering this, JD made the decision that he was ready to tell his story and, thus, decided to file his own separate action (apart from the class action in which he was included as an absent putative member) as set forth herein.

## II.     OSU Knowingly Employed a Serial Sexual Predator

49.     In September 1978, Dr. Strauss was hired by OSU as an Assistant Professor in the College of Medicine. Within months after beginning his employment, Dr. Strauss began volunteering in the OSU Athletics Department. By 1980, Dr. Strauss was serving as an Associate Director of the Sports Medicine program, and in 1981, Dr. Strauss began an appointment in the Athletics Department. The Athletics Department appointment included responsibilities at the Sports Medicine Clinic located in OSU's Student Health Services, *i.e.*, the Clinic.[7]

50.     Beginning in 1978, Dr. Strauss's first year at OSU, and continuing throughout his twenty (20) years at OSU, students and OSU staff reported and referred complaints about Dr.

---

[7] Perkins Coie Report, pg. 2.

Strauss to numerous OSU employees and administrators.  As concluded in the Perkins Coie Report, as early as 1979, OSU employees in OSU's Sports Medicine program and Athletics Department were aware that Strauss was conducting genital examinations on male student-athletes that were unusually prolonged, and that Strauss refused to allow athletic training staff to be present for these protracted genital examinations.[8]

51.      Indeed, for the entire length of Dr. Strauss's employment at OSU, not less than fifty employees in the OSU Athletics Department were aware of student-athlete complaints about Dr. Strauss—at the time they were made—and corroborated them.[9]  As concluded in the Governor's Medical Board Report:  "Although many were aware of complaints or rumors about the abuse, no one advanced concerns raised by students or unraveled Strauss's 'medical' defenses of his abuse."[10]

52.      The Perkins Coie Report specifically concluded that *at least* 177 male students were sexually abused by Dr. Strauss, although the actual number is likely in the thousands, as admitted by OSU.[11]  Indeed, the Perkins Coie Report only accounted for former OSU students that were alive, identified and contacted by Perkins Coie, and willing to speak with Perkins Coie about their experiences with Dr. Strauss.

53.      From 1978 to 1996, Strauss was an OSU team doctor and had regular contact with male student-athletes in many sports including, but not limited to, baseball, football, ice hockey, tennis, swimming, fencing, wrestling, lacrosse, and soccer.  Dr. Strauss also took rotations as the

---

[8]  *Id.*
[9]  *Id.* at pg. 88.
[10]  Governor's Medical Board Report, pg. 1.
[11]  Perkins Coie Report, pg. 1; https://news.osu.edu/university-issues-annual-crime-report (last visited on September 5, 2023).

on-call physician at the Clinic and conducted physicals and other medical exams on student-athletes that were not necessarily on a team for which Dr. Strauss was responsible.

54.     As further concluded in the Perkins Coie Report, complaints of sexual abuse by Dr. Strauss date back as early as 1979, with approximately half the reports occurring from 1979 to 1988, covering the years in which JD was sexually abused and assaulted as a student-athlete at OSU.[12]

55.     The sexual abuse victims interviewed for the Report outlined Dr. Strauss's years of persistent sexual abuse and detailed the stark similarities in these many stories, described as "both highly credible and cross-corroborative."[13]

56.     Of the 177 Dr. Strauss abuse victims interviewed by Perkins Coie, 153 were associated with Dr. Strauss—at least in part—through his role in the OSU Athletics Department, as was JD.

**II.     OSU Knowingly Employed a Serial Sexual Predator**

57.     On May 17, 2019, the Perkins Coie Report was released. The Report clearly establishes OSU's repeated failures to escalate or report complaints of sexual abuse by Dr. Strauss. The Report also shows OSU repeatedly failed to act despite knowledge reaching OSU's administration, particularly in both the OSU Athletics Department and Sports Medicine Department.[14]

58.     Specifically, Dr. Strauss's sexual abuse of OSU students was widely discussed within the administration of OSU's Athletics Department, including his proclivity to conduct inappropriately lengthy and unnecessary genital exams.[15]

---

[12] *Id.* at pg. 39.
[13] *Id.* at pg. 13.
[14] *Id.* at pg. 2.
[15] *Id.* at pg. 88.

59.     As concluded in the Perkins Coie Report, these behaviors would continue for almost two more decades.  The Report also explicitly confirmed that the genital exams engaged in by Dr. Strauss served no medical purpose whatsoever, and only served to satisfy Dr. Strauss sexual predilections and for Dr. Strauss's horrid personal sexual gratification.[16]

60.     As complaints of sexual assaults by Dr. Strauss continued to skyrocket over the years, OSU continued to take no action whatsoever, as confirmed by the Perkins Coie Report: "Despite the persistence, seriousness, and regularity of such complaints, no meaningful action was taken by [OSU] to investigate or address the concerns until January 1996.[17]  Moreover, OSU could have, but did not (i) at the very least, impose conditions on Dr. Strauss's employment, such as a chaperoning policy, (ii) terminate Dr. Strauss for his known sexual assaults of OSU students, and, (iii) pass on the credible reports of Dr. Strauss's regular and persistent abuse of OSU students to the Ohio Medical Board, nor to Federal, State, or local law enforcement.  Indeed, OSU did not even meaningfully investigate Dr. Strauss until eighteen (18) years after he began abusing OSU students and student-athletes, despite the fact that reports of Dr. Strauss's abuse began pouring in almost immediately after his employment at OSU began in 1978.

61.     Among the most troubling facts included in the Perkins Coie Report, and in other complaints filed in the related OSU actions, was the number of OSU employees that had specific knowledge of OSU student complaints against Dr. Strauss, and yet consciously decided to do absolutely nothing.

62.     The following are some examples of reported incidents of sexual abuse by Dr. Strauss on OSU student-athletes identified in the Perkins Coie Report, or otherwise publicly available, and the OSU personnel that knew about them while JD was a student at OSU:

---

[16] *Id.* at pg. 48.
[17] *Id.* at pg. 3.

   i)    In 1978, Dr. Strauss fondled a wrestling team member, David Mulvin, during a physical exam for a routine wrestling infection—with Dr. Strauss attempting to sexually arouse David during the exam. David went immediately to the student health center where he complained about Dr. Strauss's fondling to another doctor. The doctor confirmed for David that the exam he described was "not normal." The doctor then explained that he would make a note about Dr. Strauss's behavior and pass it along to other appropriate administrators. David believed that the doctor he reported to was Dr. Strauss's boss at the time and would take action.[18] This doctor then examined David, without touching him, and gave him an antibiotic. To the extent the health center doctor or OSU actually did anything to address this report, it was entirely ineffective, because Dr. Strauss kept moving up the ranks at OSU and would go on to sexually assault thousands of more students and student-athletes.

   ii)    Also, in 1978, an OSU wrestler visited Dr. Strauss for a groin injury.[19] The wrestler's injury had caused a blister and bruise on the wrestler's penis, but Dr. Strauss told him it was from masturbating.[20] Dr. Strauss then told the wrestler that Dr. Strauss needed to *milk* his penis. Dr. Strauss began masturbating the wrestler's penis until the wrestler ejaculated.[21] Shortly after the exam, the wrestler told his Head Coach Chris Ford exactly what happened. Head Coach Ford told the wrestler that he would look into it, but the Coach did not appear to believe him.[22] It does not appear that Head Coach Ford, or anyone else at OSU, did anything to investigate this report.

---

[18] https://sanduskyregister.com/news/91853/perkins-wrestling-champion-among-first-accusers-of-osu-doctor (last visited on September 5, 2023).
[19] (Proposed Corrected) Second Amended Complaint, *Snyder-Hill, et al. v. The Ohio State University* (S.D.Oh. 2:18-cv-00736-MHW-EPD) (Dkt. No. 103-2) ("Snyder-Hill SAC"), pg. 172-73.
[20] *Id.* at pg. 173.
[21] *Id.*
[22] *Id.*

     iii)    By 1979, OSU personnel in the Athletics Department and Sports Medicine program were aware that Dr. Strauss was conducting genital examinations on male student-athletes that were unusually prolonged, and that Strauss refused to allow athletic training staff to be present for these protracted genital examinations.[23] It does not appear that OSU administrators did anything regarding these reports.

     iv)    From 1980, through 1984, Melvin Robinson (an OSU track and field athlete) was treated by Dr. Strauss two (2) to three (3) times per year for mandatory physicals and various injuries.[24] During each exam, Dr. Strauss told Melvin to drop his pants and Dr. Strauss would proceed to touch Melvin's genitals.[25] Dr. Strauss's exams made Melvin extremely uncomfortable, and Melvin thought they may be inappropriate. After Melvin's first two visits to Dr. Strauss, Melvin told Head Coach Frank Zubovich he did not want to see Dr. Strauss anymore.[26] After each additional exam by Dr. Strauss, Melvin continued to tell Head Coach Zubovich he did not want to be examined by Dr. Strauss anymore, but Head Coach Zubovich completely ignored his multiple requests.[27] In addition, Head Coach Zubovich, nor OSU, did anything to investigate Melvin's complaints.

     v)    In 1981, Dr. Strauss himself recognized that "rumors" about his sexual misconduct were circulating at OSU.[28] It does not appear that OSU did anything to investigate the rumors that Dr. Strauss himself knew about.

---

[23] Perkins Coie Report, pg. 2.
[24] Snyder-Hill SAC, pg. 71.
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] Perkins Coie Report, pg. 95.

vi)     In 1983, a member of the OSU Men's Tennis Team received a physical from Dr. Strauss.[29]  During his physical, Dr. Strauss held the player's penis and said that it was a good size.[30]  Dr. Strauss held the player's foreskin and commented about the player being uncircumcised.  Dr. Strauss then seemingly asked about the player's sexual performance with an uncircumcised penis.  Dr. Strauss continued to hold the player's penis and foreskin for a prolonged period of time, and the player became increasingly uncomfortable.  Dr. Strauss eventually released the player's penis.[31]

vii)    The player's physicals with Dr. Strauss were unlike any physical he had undergone previously or since then.  Each year at OSU, the player tried to avoid getting his annual physical from Dr. Strauss because he felt uncomfortable about the way Dr. Strauss touched his genitals.[32]  But, each year Head Coach John Daly informed the player that he had to get his physicals from Dr. Strauss or he would not be eligible to play tennis at OSU.[33]  Head Coach Daly even went so far as to joke that sending tennis players to Dr. Strauss was a form of punishment.[34]

viii)   Also, in 1983, an OSU Head Coach received a report regarding Dr. Strauss when a student sought treatment for a foot injury and was forced to drop his pants.[35]  It does not appear that this Head Coach or OSU did anything to investigate this report or otherwise confront Dr. Strauss about it.

---

[29]  Snyder-Hill SAC, pp. 87-88.
[30]  *Id.* at pg. 88.
[31]  *Id.*
[32]  *Id.*
[33]  *Id.*, at 89.
[34]  *Id.*  At least one other tennis player reported similar conduct by Head Coach Daly (*id.* at 96).
[35]  Perkins Coie Report, pg. 96.

ix)     In 1984, this same Head Coach received reports from numerous student-athletes that Dr. Strauss was observing them take showers.[36] Once again, it does not appear that this Head Coach or OSU did anything to investigate this report or otherwise confront Dr. Strauss about it.

x)      Also, in 1984, Kurt Huntsinger (an OSU Swimmer) was directed to Dr. Strauss for his mandatory physical.[37] Once in the exam room, Dr. Strauss instructed Kurt to drop his trousers. Dr. Strauss then sat at eye level with Kurt's genitals and began to closely examine Kurt's penis and testicles, moving his penis up and down and side to side.[38] Kurt was uncomfortable with the examination and even commented to Dr. Strauss about it. After this first physical, and on several occasions after that, Kurt told Head Coach Dick Sloan that he was uncomfortable with Dr. Strauss's examination. Head Coach Sloan, however, made light of the complaint, laughed about other athlete's descriptions of their own examinations, and said that is just what Dr. Strauss does.[39]

xi)     In 1986, Dr. Robert Murphy, OSU's Head Team Physician, advised Dr. Strauss that rumors of Dr. Strauss's sexual abuse during physical exams were prevalent throughout the fencing team. Dr. Strauss and Dr. Murphy agreed that Dr. Strauss would avoid treating fencers.[40] Unbelievably, neither Dr. Murphy nor OSU did anything to protect non-fencers. It is entirely illogical to believe that Dr. Strauss's sexual abuse was limited to fencers, even if fencers were the only ones to report the abuse—which of course is not true. Instead of investigating the reports, OSU and Dr. Murphy did nothing and

---

[36] *Id.*
[37] Snyder-Hill SAC, pg. 64.
[38] *Id.*
[39] *Id.*
[40] Perkins Coie Report, pg. 95.

allowed the potential continued abuse of all OSU male students and non-fencer male student-athletes.

xii)    Also, in 1986, Kelly Reed (an OSU track and field athlete) visited Dr. Strauss after tearing a hamstring.[41]  During the exam, while Kelly's genitals were right "in front" of Dr. Strauss, Dr. Strauss "grabbed [Kelly's] genitals.  And while he did that, he had the gown up.  He was telling me how great my legs are.  He said 'Oh my God. You have a really nice body.'"[42]  Dr. Strauss then took Kelly's penis in one hand and began rubbing his testicles with the other hand.[43]  Kelly ended the exam early, put on his clothes, and left.[44]  Kelly tried to meet with Athletic Director, Rick Bay, but "was ignored."[45]  Kelly also told OSU Trainer Rob Morris, but Mr. Morris did not seem to take the allegations seriously.[46]

xiii)   Kelly also told Head Coach Frank Zubovich and Assistant Coach Roger Bowen about Dr. Strauss massaging his genitals, but Head Coach Zubovich did not take it seriously and Assistant Coach Bowen simply laughed at Kelly.[47]  Kelly followed up with Head Coach Zubovich to see if the Coach had reported Dr. Strauss, but Head Coach Zubovich ignored him and nothing changed with Dr. Strauss at OSU.[48]  It does not appear that Head Coach Zubovich or anyone else at OSU, ever meaningfully investigated the matter.

---

[41] https://www.wkyc.com/article/news/local/ohio/new-federal-lawsuit-filed-against-ohio-state-university-over-alleged-sexual-abuse/95-582514930 (last visited on September 5, 2023).
[42] *Id.*
[43] Snyder-Hill SAC, pg. 54.
[44] *Id.*
[45] https://www.wkyc.com/article/news/local/ohio/new-federal-lawsuit-filed-against-ohio-state-university-over-alleged-sexual-abuse/95-582514930 (last visited on September 5, 2023)
[46] Snyder-Hill SAC, pg. 54.
[47] *Id.*
[48] *Id.* at pg. 55.

xiv)   In 1986 or 1987, an OSU swim team member had a physical performed by Dr. Strauss.[49]  While at eye level with the swimmer's genitals, Dr. Strauss began manhandling the swimmer's penis and scrotum, grabbing the swimmer's penis and moving it in all different directions.[50]  When the swimmer tried to tell Head Coach Dick Sloan that the swimmer was uncomfortable with Dr. Strauss, Head Coach Sloan cursed at him and ordered into the swimming pool.[51]  In addition, Head Coach Sloan rebuffed or entirely ignored any negative comments other Swim Team members made about their exams from Dr. Strauss while the swimmer was at OSU from 1986 to 1990.

xv)   In the late-1980s, Roger Beedon (an OSU ice hockey player) went to Dr. Strauss for a physical examination.  During the examination, Dr. Strauss sat on a stool directly in front of Roger, with Dr. Strauss's head at about the height of Roger's penis.[52]  Dr. Strauss required Roger to completely remove his shorts and underwear.  After completing a hernia exam, Dr. Strauss took Roger's penis and lifted it up towards his belly button, inspecting his scrotum.  During this time, he placed his hands on Roger's testicles several times.  In Roger's opinion, Dr. Strauss was trying to stimulate him sexually.[53]

xvi)   Dr. Strauss also isolated Roger at the OSU ice rink and photographed Roger with his shirt off.  Roger, along with a teammate, reported Dr. Strauss's conduct to then-assistant athletic trainer (later Director of Athletic Training) Bill Davis, who expressed concern, but apparently did nothing.[54]

---

[49] *Id.* at pg. 146.
[50] *Id.* at pg. 146-47.
[51] *Id.* at pg. 147.
[52] (Proposed) Second Amended Class Action Complaint, *Garrett, et al. v. The Ohio State University* (S.D.Oh. 2:18-cv-00692-MHW-EPD) (Dkt. No. 126) ("Garrett SAC"), pg. 22.
[53] Garrett SAC, pp. 22-23.
[54] Garrett SAC, pg. 23.

xvii)   In 1988, Student R and a teammate were questioned by Mr. Davis about Strauss's exams in detail.  Student R remembered Mr. Davis being concerned and thought Strauss would be fired or removed, but nothing ever happened.[55]

xviii)   Also in 1988, an Assistant Coach corroborated that Student R reported to the Assistant Coach about Dr. Strauss and that Mr. Davis was involved in evaluating Student R's report.[56]  The Assistant Coach then met with Mr. Davis, as well as the team's head coach to discuss Student R's report.[57]  Mr. Davis and the head coach "decided then and there" that Dr. Strauss would never see an athlete without a trainer present.[58] Obviously, this decision was not implemented and at least hundreds, if not thousands, more OSU student-athletes would continue to be sexually abused by Dr. Strauss.

xix)   In 1989, another OSU team physician recalled that he witnessed a student emerge from an exam and announce to the training room that Dr. Strauss had inappropriately examined his genitals.[59]  The team physician recalled speaking to the athletic trainer and that the trainer reported this information to Dr. Murphy (OSU Head Team physician) to be investigated.[60]  Although the team physician recalls being told by the trainer that the issue had been investigated, there is no evidence that OSU or Dr. Murphy ever investigated or followed up on the incident in any meaningful way.[61]

---

[55] Perkins Coie Report, pg. 104.
[56] *Id.* at pg. 105.
[57] *Id.*
[58] *Id.*
[59] *Id.* at pg. 101.
[60] *Id.*
[61] *Id.*

xx)   In the late 1980s, a nurse reported to Dr. Doris Charles (OSU's Student Health Director) that Dr. Strauss's examinations of male students took much "longer than normal."[62] Dr. Charles dismissed these concerns and did nothing.[63]

xxi)   In the late 1980s to early 1990s, Assistant Athletic Director Larry Romanoff repeatedly reported to Dr. Murphy that Dr. Strauss was showering with student-athletes.[64] It does not appear, however, that Dr. Murphy ever followed up on the reports or showed any concern at all.[65]

63.   The Perkins Coie Report goes through the OSU departments where Dr. Strauss was employed: Student Health, the Athletics Department, the Clinic, etc., and who, in each department, had knowledge of Dr. Strauss's reported sexual abuse.

64.   And, if any one of these dozens of OSU agents, employees, or administrators with knowledge had taken action, investigated further, escalated the reports to OSU executives or reported to law enforcement, Dr. Strauss's reign would have been stopped. But these people, individually and collectively, did absolutely nothing to protect OSU students.

65.   Moreover, the Perkins Coie Report is shocking in its account of just how many OSU personnel admitted that they knew of Dr. Strauss's sexual misconduct when Dr. Strauss was employed at OSU.

66.   It bears noting that the following numbers do not account for other OSU employees that were no longer alive in 2018-19, or that otherwise simply chose not to be interviewed by Perkins Coie:

---

[62] *Id.* at pg. 121.
[63] *Id.*
[64] *Id.* at pg. 100.
[65] *Id.*

i) At least two (2) OSU Athletic Directors received reports about Dr. Strauss's sexual misconduct.

ii) At least two (2) OSU Head Team Physicians received reports about Dr. Strauss's sexual misconduct.

iii) At least six (6) OSU Assistant Athletic Directors received reports about Dr. Strauss's sexual misconduct.

iv) At least five (5) OSU Team Physicians received reports about Dr. Strauss's sexual misconduct.

v) At least twenty-two (22) OSU Coaches received reports about Dr. Strauss's sexual misconduct.

vi) At least one (1) OSU Athletic Training Director received reports about Dr. Strauss's sexual misconduct.

vii) At least four (4) OSU Athletic Trainers received reports about Dr. Strauss's sexual misconduct.

67. An unknown number of other OSU personnel, executives, lawyers, trustees, and other OSU agents were aware of complaints against Strauss, or at a minimum, had heard rumors about his disturbing conduct while treating male students and male student-athletes.

68. Any one of the OSU individuals referenced in the preceding paragraphs herein, each an agent of OSU, was an "appropriate person" under the law. And, each of these referenced individuals was in a position to protect students.

69. But, for two decades, while thousands of unsuspecting students were subjected to rape, sodomy, and other pervasive sexual molestation, OSU took no action to investigate, to

intervene, to share, to escalate, to publicize, to remove, to discipline, to report, or to otherwise protect OSU students and Student Athletes from Dr. Strauss.[66]

### III. Dr. Strauss is Finally Investigated, But OSU Continues to Cover His Tracks and Enable Dr. Strauss's Sexual Abuse of OSU Students

70. The Perkins Coie Report set forth that, in January 1995, "Coach A" acknowledged that he personally confronted Dr. Strauss about Dr. Strauss's propensity for showering with student-athletes. "Coach A" never elevated this concern because he thought he adequately addressed the issues with Dr. Strauss.[67]

71. Also, in January 1995, two student-patients (Students A and B) from the Clinic each reported complaints of sexually inappropriate conduct by Dr. Strauss to OSU Student Health administrators.[68]

72. In January 1996, after Student C reported being molested by Strauss to Dr. Ted Grace, Dr. Strauss was finally—after eighteen (18) years of abusing and molesting OSU students and student-athletes under his care—placed on administrative leave from Student Health and the Athletics Department.[69] In June 1996, OSU's Student Affairs held a disciplinary hearing into these three recent complaints and a 1994 complaint handled by John Lombardo (OSU Head Team Physician)—no other complaints were investigated at this time.[70]

---

[66] OSU's pattern of ignoring its students' civil rights is nothing new, and likely is continuing at OSU today. *See* Letter from Meena Morey Chandra, Regional Director, Reg. XV, Office for Civil Rights, U.S. Dep't Educ., to Dr. Michael V. Drake, President, Ohio State University 2 (Sept. 11, 2014), https://www2.ed.gov/documents/press-releases/ohio-state-letter.pdf (last visited on September 5, 2023); *see also see also* Resolution Agreement, Ohio State University, OCR Docket #15-10- 6002, available at https://www2.ed.gov/documents/press-releases/ohio-state-agreement.pdf (last visited on September 5, 2023); *and* Jennifer Smola, *Ohio State closes sexual-assault center, fires 4 after complaints*, The Columbus Dispatch (last updated June 20, 2018), https://www.dispatch.com/story/news/education/campus/2018/06/19/ohio-state-closes-sexual-assault/11914642007/ (last visited on September 5, 2023).
[67] Perkins Coie Report, pg. 91.
[68] *Id*. at pg. 114.
[69] *Id*. at pg. 114-15.
[70] *Id.* at pg. 147.

73.     Despite these complaints, and Dr. Strauss's well-known history and scope of sexual abuse at OSU, Dr. Strauss was only terminated from OSU's Athletics Department, "remain[ing] employed at [OSU] as a tenured professor in the School of Public Health."[71]

74.     OSU did remove Dr. Strauss from his position in the OSU Athletics Department, but OSU did not report these findings of abuse to the Ohio Medical Board or to law enforcement, which allowed Dr. Strauss to continue seeing patients. Indeed, as concluded in the Governor's Medical Board Report: "[N]one of the physicians working with [Dr.] Strauss found occasion to report him to the Medical Board or to law enforcement – even after [OSU] suspended him from seeing patients . . . [nor] did [OSU] or any of its administrators involve campus or outside law enforcement, even after recognizing that the severity and pervasiveness of [Dr.] Strauss' abuse compelled the withdrawal of authority to see patients and the nonrenewal of his contract."[72]

75.     OSU further allowed Dr. Strauss to open an off-campus men's clinic in 1996, advertise in OSU's student newspaper in both 1996 and 1997, and permitted him to offer a student discount, enabling Dr. Strauss's continued abuse of OSU students.[73]

76.     Among its multiple failures, OSU's Student Affairs investigation in 1996 never sought to identify Dr. Strauss's many victims. Moreover, as set forth in the Perkins Coie Report, OSU failed to take "additional steps to identify other students who had previously complained about [Dr.] Strauss," even as OSU falsely asserted to the Ohio Medical Board that it was working to do so.[74] If OSU had made even the slightest efforts to identify and inform victims of Dr. Strauss's abuse and molestation, OSU would have been able to start the healing process for these

---

[71] *Id.* at pg. 145-46.
[72] Governor's Medical Board Report, pg. 3.
[73] Perkins Coie Report, pg. 5.
[74] *Id.* at pg. 4.

victims twenty-four (24) years ago. But, consistent with its history of indifference to its own students' suffering, OSU did nothing.

77.    In October 1997, Dr. Strauss announced that he was retiring from OSU, likely because he now had more limited access to students, and particularly student-athletes. Quite unbelievably, however, when Dr. Strauss's retirement became effective in March 2018, OSU's "Board of Trustees approved [Dr.] Strauss's appointment as Faculty Emeritus in [OSU's] School of Public Health."[75]

## IV.    JD Did Not Know That He Was Even Sexually Abused Until Recently, But Regardless—Even if He Did—JD Could Not Have Reasonably Discovered That Both Dr. Strauss's Sexual Abuse Was Widespread and that OSU Knew About It and Did Nothing

78.    According to the recent testimony of several senior OSU administrative physicians that work with—and had supervisory responsibilities over—Dr. Strauss, OSU student-victims could not have known about OSU's awareness (as early as 1978) and willful disregard of Dr. Strauss's pervasive sexual abuse of OSU students and student athletes, until the release of the Perkins Coie Report. Specifically, Dr. Ted Grace (former Director of OSU Student Health Services) testified:

> Q: Is there any way any Ohio State student could have known that their university failed on the job for 20 years to get rid of [Dr. Strauss]?
>
> OSU COUNSEL: Object to the form of the question.
>
> A: I don't know of any way.

Dr. Ted Grace Tr., at pg. 307.

79.    Dr. Roger Miller, former Chief of Preventative Medicine of OSU Student Health and former Lead Physician of OSU Student Health, testified:

---

[75]  *Id.* at pg. 154.

Q: Reading [the] Perkins Coie [Report] you came to learn that Dr. Strauss started abusing patients in the late 1970s; correct?

A: Yes.

Q: That's not information you knew before; right?

A: That's correct.

. . .

Q: And is there any way OSU -- any OSU student could have known that Dr. Strauss was a sexual predator against students for over 20 -- for approximately 20 years before OSU got rid of him?

A: I don't believe they would have known.

Dr. Roger Miller Tr., at pg. 314.[76]

## **CLAIMS FOR RELIEF**

### **COUNT I**
**Violation of Title IX, 20 U.S.C. § 1681, *et seq.***
**OSU's Sexually Hostile Culture and Heightened-Risk of Sexual Harassment**

80.     JD incorporates by reference the allegations set forth above as if fully set forth herein and below.

81.     Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

---

[76]  OSU student-victims' lack of knowledge is further supported by the testimony of several physicians that were Dr. Strauss's supervisors at the relevant time.  These physicians each assert that they had no knowledge of the rumors, reports, or complaints against Dr. Strauss until the public release of such information in 2018 or 2019 (Dr. Forrest Smith Tr., pg. 100; Dr. John Lombardo Tr., pp. 56, 169, and 235).

82. Title IX is implemented through the Code of Federal Regulations. *See* 34 C.F.R. Part 106. 34 C.F.R. § 106.8(b) provides: ". . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

83. Sexual harassment of students is a form of sex discrimination covered by Title IX. Sexual harassment is unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.

84. Title IX covers all persons subjected to discrimination in any program or activity of a school that receives any federal financial assistance and covers sexual harassment— including sexual assault and sexual abuse—by school employees, students, and third parties. Title IX requires OSU to promptly investigate all allegations of sexual harassment, including sexual assault and abuse.

85. Dr. Strauss's pervasive sexual harassment and abuse of JD and others, as described herein and in other complaints filed in the related actions, is sex discrimination under Title IX— taking place over nearly two decades.

86. OSU had actual knowledge of Dr. Strauss's serial sexual harassment and permitted it to continue unchecked until at least 1996.

87. OSU was specifically notified of Dr. Strauss's sexual harassment and abuse of OSU students (prior to JD's abuse) by and through OSU employees with authority to take corrective action. As identified above, these specific OSU employees include, but are not limited to: Head Team Physician and Director of Sports Medicine Dr. Bob Murphy; Assistant Athletic Director Larry Romanoff; Head Tennis Coach John Daly; Head Track and Field Coach Frank Zubovich;

Head Swimming Coach Dick Sloan; Head Wrestling Coach Chris Ford; Athletic Director Rick Bay; Athletics Trainer Rob Morris; Assistant Track and Field Coach Roger Brown; Director of Athletics Training Bill Davis; and Student Health Director Dr. Doris Charles.

88.     As identified in additional publicly available materials, other specific OSU employees with authority to take corrective action include, but are not limited to: Director of Student Health Services, Dr. Ted Grace; Athletic Director and Assistant OSU Vice President Andy Geiger; Athletic Director Jim Jones; Assistant Athletic Director Archie Griffin; Athletic Director Hugh Hindman; Senior Associate Athletic Director Paul Krebs; Head Fencing Coach Charlotte Remenyik; Associate Sports Information Director Steve Snapp; Assistant Athletic Director Richard Delaney; Assistant Director of Student Athlete Support Services John Macko; Head Athletic Trainer Billy Hill; Head Wrestling Coach Russ Hellickson; and Head Gymnastics Coach Peter Kormann.

89.     OSU was required to, but did not, promptly investigate and address the pervasive allegations, reports, and complaints of misconduct by Dr. Strauss thereby creating a heightened-risk that JD—and others—would be sexually assaulted.

90.     OSU created a sexually hostile culture within its education programs and athletic activities—which led to a heightened-risk that JD (and others) would be sexually assaulted, through, among other things: (i) failing to promptly investigate and respond to complaints about Dr. Strauss's conduct; (ii) promoting Dr. Strauss within OSU thereby enabling his ever increasing access to sexually abuse OSU students; (iii) failing to appropriately supervise Dr. Strauss after reports of his sexual abuse of students began pouring in; (iv) intentionally and deliberately requiring student-athletes to get their annual physicals and other medical care from Dr. Strauss despite these student-athletes discomfort with Dr. Strauss and the coaches' and administrators

knowledge of Dr. Strauss's inappropriate sexual conduct towards students; (v) cavalierly dismissing and joking about complaints regarding Dr. Strauss from students and student-athletes; (vi) threatening student-athletes with dismissal from teams if they refused to be treated by Dr. Strauss; (vii) concealing the scope of abuse by Dr. Strauss even after an OSU investigation found Dr. Strauss to be a sexual predator; and, (viii) enabling Dr. Strauss to continue his abuse of OSU students by allowing him to open a nearby men's clinic and advertise it in the OSU student newspaper.

91.     The sexual abuse that JD suffered was so severe that it effectively barred his access to continued educational opportunities, including a safe educational environment and appropriate medical care.  As a direct and proximate result of OSU's creation of and deliberate indifference to a sexually hostile educational environment on OSU's Campus, which violated Title IX, JD suffered, and continues to suffer, damages and injuries.

## **COUNT II**
### **Violation of Title IX, 20 U.S.C. § 1681, *et seq.***
### **OSU's Deliberate Indifference to Reported Sexual Harassment**

92.     JD incorporates by reference the allegations set forth above as if fully set forth herein.

93.     Years before Dr. Strauss sexually assaulted JD, OSU had actual knowledge of Dr. Strauss's prior sexual harassment and abuse of male students and student-athletes at OSU. Moreover, between 1978 and 1996, numerous students and student-athletes complained to OSU administrators and staff about Dr. Strauss's inappropriate conduct.

94.     Based upon this reported sexual misconduct by Dr. Strauss, OSU had actual knowledge of the substantial risk, and in fact the likelihood, that Dr. Strauss would sexually harass and abuse other OSU students and student-athletes, like—and including—JD.

95.     OSU agents, employees, administrators, and officials, armed with this knowledge, had the authority to address the risk posed by Dr. Strauss, and had the authority to take corrective measures—but until no earlier than 1996, failed to act. OSU's failure to address the substantial risk to OSU students posed by Dr. Strauss was manifestly unreasonable in light of the known circumstances surrounding Dr. Strauss. As such, OSU was deliberately indifferent to the substantial risk that Dr. Strauss would sexually harass and abuse other OSU students and student-athletes, like—and including—JD.

96.     Indeed, OSU's deliberate indifference directly created the heightened-risk of sexual misconduct that JD did in fact experience at the hands of Dr. Strauss while JD was a student-athlete at OSU. Moreover, as a result of OSU's deliberate indifference, JD was subjected to the severest of sexual abuse by Dr. Strauss, depriving him of access to educational opportunities and benefits, including a safe educational environment and appropriate medical care.

97.     As a direct and proximate result of OSU's deliberate indifference to Dr. Strauss's prior sexual harassment of OSU students and student-athletes, which violated Title IX, JD has suffered, and continues to suffer, damages and injuries.

## **PRAYER FOR RELIEF**

Wherefore, JD respectfully requests that this Court:

A.     Enter judgment against OSU, and in favor of JD, in such amounts that will completely and adequately compensate JD for all the damages he has suffered including, but not limited to, payment of JD's medical and other expenses incurred as a consequence of the sexual assault of JD and OSU's deliberate indifference to Dr. Strauss's pre-assault conduct; damages for JD's pain and suffering as a result of Dr. Strauss's sexual assault of JD and OSU's deliberate indifference to Dr. Strauss's pre-assault conduct; damages for deprivation of equal access to the

educational opportunities and benefits provided by OSU; and, damages for past, present and future emotional pain and suffering as a result of Dr. Strauss's sexual assault of JD and OSU's deliberate indifference to Dr. Strauss's pre-assault conduct, in an amount to be determined at trial;

      B.      Award JD punitive damages against OSU in an amount to be determined by a jury for OSU's violations of federal law;

      C.      Award JD pre-judgment and post-judgment interest;

      D.      Award JD his actual expenses of litigation, including reasonable attorney's fees pursuant to 42 U.S.C. § 1988(b); and

      E.      Award JD such other and further relief as the Court deems just and proper.

Dated: Columbus, Ohio
September 18, 2023

                        Respectfully Submitted,

                        /s/ John C. Camillus
                        John C. Camillus, Trial Attorney (0077435)
                        Law Offices of John C. Camillus, LLC
                        P.O. Box 141410
                        Columbus, Ohio 43214
                        (614) 992-1000
                        (614) 559-6731 (facsimile)
                        jcamillus@camilluslaw.com

                        Mitchell Schuster, Esq. (*pro hac vice* forthcoming)
                        Benjamin D. Bianco, Esq. (*pro hac vice* forthcoming)
                        Meister Seelig & Fein PLLC
                        125 Park Avenue, 7th Floor
                        New York, New York 10017
                        (212) 655-3500
                        (212) 655-3535 (facsimile)
                        ms@msf-law.com
                        bdb@msf-law.com

                        ***COUNSEL FOR PLAINTIFF***

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true and correct copy of the foregoing document was filed via the Court's CM/ECF system on September 18, 2023.


By:  _/s/ John C. Camillus_____
Attorney for Plaintiff